This case is Ameren CIPS v. Industrial Commission 5100183. Counsel, please. May it please the court. Counselor, my name is Don Murphy and I'm here for the appellate court in this case. Your Honors, we are here today for a review of the Williamson County Circuit Court's finding of permanent and total disability. Counsel, let me stop you right there. You realize that we review the Commission's decisions. We don't review the Circuit Court's decision. That's our function. We're reviewing the Commission on the manifest way, not the Circuit Court. The Commission found permanent and total disability in this case. We're asking that that decision be reviewed by this court. As a result, the question on review is an issue of fact, and I believe that the court's review of the evidence in this case will show that a decision opposite of that reached by the Commission is clearly apparent in this case. The employer asks that you consider two main issues when evaluating the evidence in this case. First, does the medical and vocational evidence support a finding of permanent and total disability? And second, is the testimony of Mr. Edmonds and his witness George Briscoe supported by the evidence with regards to Mr. Edmonds' association with voodoo outfitters? Let me begin with the first point. The medical evidence does not support a finding of permanent and total disability. Mr. Edmonds underwent an L3-4 microdiscectomy performed by Dr. Kevin Rutz. When his condition did not significantly improve following the surgery, a redo microdiscectomy and a fusion was performed at the L3-4 level by Dr. Park. Following Mr. Edmonds' recovery from the surgery, Dr. Park suggested that he had reached maximum medical improvement and he needed to undergo a functional capacity evaluation to determine what, if any, permanent restrictions should be implemented. The restrictions that were suggested were for no lifting greater than 10 pounds, no greater than 4 hours walking or standing, and bending, twisting, squatting, climbing, pushing, pulling, and reaching overhead only occasionally. Now, Your Honors, the results of these, the basis for these restrictions was a functional capacity evaluation that, again, Dr. Park ordered. The employer had no part in deciding who was going to evaluate this person at this time or which facility was to be used. Again, this was set up by the treating physician. The results of this FCE are telling. The evaluator noted multiple signs of symptom magnification. Now symptom magnification is noted rather frequently when a person who is undergoing an FCE is trying to prevent themselves from being hurt even more while performing the surgery due to pain or due to the fear of pain. But that wasn't the case in this instance. Rather, the evaluator stated that the feeling was that there was a misrepresentation of the level of pain given by Mr. Edmonds, and she even gave an explanation for why that misrepresentation occurred. And that was who? Which individual gave that opinion? What was her name? Anne-Marie Puricelli. Anne-Marie Puricelli? Yes. The quote that she gave was that these results were a, quote, conscious effort to demonstrate a greater level of pain and disability than are actually present. So she gave a motivation also for the symptom magnification activities that she observed. And then what about Dr. Wachter and Dr. Grinnell who were of the opinion that the injury was permanent in nature and that he was not employable? So what do you make of that? Well, first of all, I would agree that the injury would be permanent in nature. But the focus is going to be whether as a result of the injury he is unemployable. And Wachter opined he was unemployable. Right. And Wachter opined, gave that opinion without reviewing certain key information. He did not have the opportunity to review the FCE findings prior to giving that opinion. He did not have the opportunity to review any of the restrictions that were adopted by Dr. Park following the FCE. And he also agreed that he did not have any expertise in the area of vocational rehabilitation. So because of the lack of expertise of Dr. Wachter in determining vocational issues, both parties selected a vocational expert. And that was who, Grenfell? Yes, Your Honor. And didn't Grenfell support and conclude that Clayman could not engage in full-time work in light of his side effects, the medications, the complaints? So essentially he supported Wachter, didn't he? He agreed that Mr. Edmonds was not able to return to work. But the basis for that opinion is something that I want the Court to take a careful look at. Dr. Grenfell, one of the basis for him finding permanent total disability was this unusual sleep pattern as explained by Mr. Edmonds. And the record shows that Mr. Edmonds complained of at times needing to sleep more than 24 hours in a row following this incident. There was never an explanation in the medical records nor any explanation given by Dr. Grenfell as to why anyone, including this individual, Mr. Edmonds, would need to sleep for 24 hours in a row. Dr. Grenfell just accepted that as the truth and put it into his record. Was he on medications? He was on medications. But there were sleep issues before this accident, Your Honor. The record is clear that in this case there had been a concern with Mr. Edmonds having sleep problems well before our accident. A friend of Mr. Edmonds had told him that he was actually feared for Mr. Edmonds' safety because of the issues that he had with his sleep patterns. It's important at this time to explain a little bit of background regarding what Mr. Edmonds did at least before our accident as kind of an extracurricular activity. He was involved with an outfit known as Voodoo Outfitters that was a hunting guiding service. And they would take clients all around the state of Illinois and to other states and even other countries to guide hunts. Mr. Edmonds was, as listed on the Internet, the co-owner of this organization. Now during that time a friend of his had indicated that he was afraid for Mr. Edmonds' safety because of these significant sleep issues that he had. Mr. Edmonds stated in the medical records that he could, well before this accident, well before he started taking medication, would just simply fall asleep at what's called the drop of a hat. A sleep study was ordered to find out what it was that was causing Mr. Edmonds to have these unusual sleep activities and Mr. Edmonds never went to that appointment. So while it is true that if you look at Mr. Edmonds after the fact, after the injury, after he's on medication, after he's had his treatment, that he certainly does have sleep problems that may even interfere with his employability, those problems were present well before our accident. Was this presented to the Commission, the arbitrator? All this evidence was argued, right? Yes. Okay. And they found it against that position, did they not? They did. Okay. So why is that against the manifesto of the evidence? Because if you look at the vocational evidence of actually looking for employment within the restrictions that Mr. Edmonds had, the only person to actually look for him a job was Adrian Berg with Corvell, the vocational expert that was retained by the employer in this case. So you have Dr. Grinfeld who says, I don't believe he can return to work, but he never really looked for any work. In fact, he testified that he looked for zero jobs to find out what Mr. Edmonds' level of employability was. Conversely, if you look at the activities of Adrian Berg before rendering her opinions, she was presented with all of the evidence regarding the restrictions that he had, the medications that he took, and she actually found a dozen jobs in the geographical area where Mr. Edmonds lived where he was not only qualified, but where he was able to perform those jobs within the physical restrictions that he had. All right, so in essence, you're arguing now, and I understand your point, that the jobs, that the assessments made by the witnesses you're citing were more thorough, more professional and more detailed, versus the experts on the other side, Wachter and Grinfeld, and yet the Commission chose to believe Wachter and Grinfeld, which clearly they have the right to do, don't they? They do. So if they choose, which is strictly within the province under the law, they have to assess the credibility and believability of the witnesses and resolve the conflicting medical testimony, which they did. Two witnesses on one side for the claimant, two on the other side. They rule in favor of the claimant based on the claimant's witnesses, and your argument is what? They got it wrong, and so we should reverse them because they got it wrong? Well, my argument is the basis for their opinions. It's not just who had the most people testify. It is, what were the basis of the opinions of those people that were testifying? Now, you're saying the basis were flawed on the other side. Okay, let's assume that you're making the argument it's a flawed basis. The Commission didn't see it that way. Correct. So it's within the province of this court to say that the manifest weight of the evidence supports a finding contrary to what the Commission reached. Even though the Commission is given the first opportunity, and is given the opportunity to review issues of fact within their own province, there still is the right of this court to overturn those decisions when the manifest weight of the evidence is different. When an opposite conclusion is clearly apparent, how do we accede to your position without doing violence to the well-settled rule that it is not within our province to re-weigh the evidence and substitute our judgment for that of the Commission? In essence, you're asking us to substitute our judgment for that of the Commission. I'm asking you to review the evidence in light of whether there was significant enough evidence for the Commission to reach the decision that they made. They provided no explanation for their opinion, and the arbitrator, the Commission basically adopted the opinion of the arbitrator. The arbitrator didn't specifically address these issues either in that opinion. So there's no real guidance on what the basis was for the finding of the Commission. So this court has the opportunity to look at the evidence and say, based upon the foundations given for these different arguments, the positions of these different experts, who was provided with the most significant evidence before rendering their opinion. And in doing that, we're not re-weighing the evidence in any way if we do that, are we? No, you're taking the step that is allowed for the court to take in deciding if the manifest way of the evidence is supported or not by what the Commission's decision was. And if you look at the manifest way of the evidence, it clearly establishes that the medical evidence and the vocational evidence supports a finding that this gentleman is not permanently and totally disabled. In addition to those factors, there's also his activities after this accident that point to him not being permanently and totally disabled. I have two questions. Do you believe an employee needs to be reduced to total physical incapacity before an award of permanent total disability can be awarded? I do not believe that. All right. And then they based the employability on Adrian Bird's labor market survey, right? Correct. You were relying on him. Yes. And do you agree that she never evaluated the claimant, didn't review the testimony of Dr. Wachter, and didn't consider the side effects of his medication? I believe she did consider the side effects of his medication. Did she personally evaluate him? She did not. Did she review the testimony of Dr. Wachter? That I'm not sure of. The other issue, again, with his activities after the surgery, after the treatment had concluded with this voodoo outfitters organization is something that I would like the court to take a look at. Clearly, he was participating in some type of activity which would commonly be made in exchange for payment. Let me stop you right there. What is the evidence of that? That's sort of a red herring, isn't it? Yeah. He was listed as something to do with the voodoo outfitters. He was listed as something to do with the voodoo hunting service. And yet, according to the evidence, when the undercover investigator for the company went out, there was no surveillance video of the claimant. The investigator admitted he did not have a video showing the claimant hunting. He was unable to find anyone who had ever been on a hunt being guided by the claimant since November 2005. Is there any testimony or evidence in the record that the claimant had gone out as a His testimony was that he had taken hunts both out of the state and out of the country after that. Right. Under what they call a guide, a different type of a hunt. It wasn't like an assistant. There was a phrase for it. Well, he was the guide. He was guiding the hunt. He was assisting the hunting party. Wasn't he getting some assistance himself? Wasn't there some kind of a term they use? He certainly wasn't the only one from voodoo outfitters. Counsel, your time is up. You'll have time in a little while. Counsel, please. May it please the court. I'm Steve Stone. I represent Randy Edmonds. I want to correct something right away. There is no evidence that he ever guided a hunt. Period. That is 180 degrees contrary from the evidence. Is there evidence he went on one hunt? There's evidence that he went on about a dozen hunts over a four-year period of the time that he was injured until the time of the trial. He testified that prior to his injury, he hunted almost 100 days a year. He was a guide. He was a professional hunter. He did have a waterfowl club. He participated in all the things they claimed he participated after the fact. But he did not, in fact, do those things anymore. Because he couldn't, if you read the testimony of George Briscoe, because he couldn't do things like put out decoys, because he couldn't carry things, they phased him out of the clubs. He was a very, very good hunter. Almost legendary. He was the president of the National Wild Turkey Federation. Brought that organization to Southern Illinois in the late 90s. And so he had a great reputation. He had guided several times before this. Big, girly guy, you know, before this injury in alignment for amaranth. Much different person after two failed vexed. I mean, I think my focus here is just to point to points of the record to show that it's not against the manifest way of the evidence. Randy Edmonds has had two failed back surgery. Post-operatively, MRIs show that he has annular tears all throughout his lumbar spine. He has fibrosis throughout his lumbar spine. Dr. Park indicates that post-operatively, the second time he had permanent nerve damage. There's discussion about the FCE and about the validity of the FCE. At the end of the day, the FCE was deemed valid enough for his treating neurosurgeon to impose the varied restrictions that they put on him in the FCE, which is a 10-pound lifting restriction and only very limited physical activity. Randy walks with a limp. Uses a cane. Uses a cane to get up out of a chair. Uses a cane to sit down in a chair. Oftentimes uses a wall to walk down a hallway. He takes MS content daily. He takes morphine daily. In addition, weekly, he adds amitriptyline, Ambien, and Cymbalta. When you add amitriptyline and Ambien, which are sleep-inducing medications, to morphine and MS content, Randy Edmonds goes to sleep for much of the day. He cannot predict whether it's going to be a Monday, a Tuesday, a Wednesday, a Thursday, or a Friday, when he's going to need six medications instead of just two. And so he is not someone that can routinely, predictably answer the bell of employability. That's what Dr. Grenfell testified to, was that if you just focus on his FCE restrictions alone, he could work. If you overlay that with all the medications he's on, how it affects his sleep, how it affects his mental acumen, his concentration, you consider all of those things, he's not employable because he can't answer the bell day in, day out, week in, week out. The testimony at trial was that it took Randy almost five days to paint four shutters, five days to paint one chair. The reason for that is he has to go lay down. If you read carefully in the transcript, we showed up for trial at 9 a.m. Trial starts at 3.30. There's testimony that during the day, while he was waiting for trial, he was laying in the back of a pickup truck because traveling from Marion, Illinois, up to Collinsville, waiting in a chair all day, made it so that he had to lay down. There's evidence of that in the record even at the trial. Is there evidence in the record that Adrienne Bird knew that and she made the recommendation that he was employable? No. Adrienne Bird, all of her opinions are based just on the FCE. She does not take into account the side effects of the medication. She initially testified she didn't even know he was on these medications and then she recounted that, okay, yeah, she did know about the medications but didn't take into consideration their side effects. She didn't talk to Dr. Wachter. She didn't talk to Randy Edmonds personally. And the 12 people or the 12 employers in Southern Illinois that she came up with as a market survey, she didn't tell them that Randy used a cane. She didn't tell them that Randy limped. She didn't tell them that Randy was on these medications. And she didn't discuss with them the fact that he was going to have to be accommodated in terms of, well, he may not show up on a Monday or Tuesday. In fact, she said in her testimony in cross-examination that an employer would expect an employee to be able to answer the bell on a consistent basis and that would be significant and it would significantly interfere with his ability to obtain work. So we have medical evidence from Dr. Wachter that he's permanent total. We have a vocational expert, Dr. Grenfell, who says he's a permanent total. And then, as Judge Wexton pointed out, there are certain things that Adrienne Byrd did not consider. In fact, Adrienne Byrd didn't do the evaluation. She was testifying based on someone else's evaluation. There is this issue about Garth from Detroit, the investigator. I'm the only one in the courtroom who had the pleasure to witness his testimony. I think it's fair to say from the record that the arbitrator and the commission did not find him credible. This was a man who was hired to come from Michigan to Southern Illinois to video-surveil my client and no video surveillance was ever put into evidence. He claims he booked a hunt with my client. He claims he confirmed the hunt with a certified letter and a check and brought neither to trot. Significantly, at the close of evidence, Amron can file a motion and say, Judge, I just need a little extra time to submit these documents, keep the proofs open for a week. That was not done. And I would suggest to you that it wasn't done because his statements that he has that proof is not credible. Justice Hudson, I think your point is really my point, which is the standard is manifest way. There has to be a clearly apparent opposite conclusion. I'm not a perfect lawyer. I probably could have done a better job but I think I got past the finish line and I think the circuit court should be affirmed and the commission should be affirmed. What about the FCE? The testimony is that a lot of his validity problems was that he had a fear of injury. What I think is important to take away from the FCE is despite what the FCE person said about his exaggerating or his symptom magnification, he did come out of the FCE with restrictions that everybody adopted. Nobody questions that he does in fact have a 10 pound weight restriction. Nobody questions that he shouldn't stand for longer than 4 hours. Nobody questions that he should only occasionally bend, twist, squat, lift, etc. So all of those things are valid. I wasn't there. The FCE person of course didn't testify. We just had a report. But I think it's Dr. Paricelli or maybe it was in the FCE report itself that suggested that he had a fear of injury. What is significant, and I do point this out in my brief, there is an explanation for how sensitive he is to pain. He has 5 level annular tears. He has 5 level fibrosis. And maybe the person conducting this FCE never dealt with a person with that much nerve damage, that much scar tissue, and that much annular tears because for 20 years I've been doing this I've never known anybody to have that much objective abnormality by MRI post-op. And I would suggest to you that that's what the commission found too. Thank you. Thank you. Rebuttal please. Your Honors, if I may, I want to focus your attention on a couple of key points. First of all, in the FCE there wasn't mention that the behaviors that he demonstrated were guarding or protecting or out of fear of being injured. In fact, it was the exact opposite that was stated by the evaluator. That this was not a situation where this person was trying to protect themselves from further injury. Rather, it was blatant signs that he was trying to make himself look more disabled than what he was. This isn't a case where you need to read between the lines to determine what it was that was the cause of these behaviors. The evaluator in the first case I've ever seen where the evaluator gives such an opinion says, this symptom magnification is a result of this individual trying to manipulate the outcome. And that's something that I think you should consider. Now, whereas I agree that a person does not have to be restricted to complete disability before permanent total disability can be awarded. I think it needs to be the goal of any recovery system such as the court system in this case to get people back to work when at all possible. And in this case it's at all possible. The only people who have tried to get him back to work has been Ameren. We set him up with a vocational expert who actually looked for and found jobs. If you look at the record, it's clear that the vocational expert that he saw looked for no jobs and therefore didn't find it. If you look at his testimony, it's clear that he hasn't looked for any jobs. That he never, after this injury, looked towards re-employment. So, rather than rewarding Mr. Edmonds for not seeking work, the employer has put forth an effort to find him another type of job, to find him another type of activity that he can perform, and Mr. Edmonds has not taken any of those steps. Also, just to clarify one issue, Ms. Bird was presented with all of the restrictions that Mr. Edmonds was on and she listed all of the medications that he was taking within her report prior to rendering her opinions. So, I asked this court to review the evidence in this case and though I agree that this court is not to sit in the position of just second guessing the findings of the commission, what it can do is determine if there is a manifest weight of the evidence contrary to the decision reached by the commission. And in this case, I think it's clear that there is. The vocational evidence and the medical evidence support the fact that this gentleman could have been returned to work in some type of light duty, sedentary position if he had wanted to. Ten such jobs were found, agreed that the representative from Corbell didn't perform a physical evaluation of him, one wasn't necessary. She was presented with information that showed that this gentleman had a high school education with some post-secondary education, that he had managerial skills, had held managerial positions before, and that he had a firm grasp of the English language and was able to handle the jobs that she found for him. What about the fact that he takes medications, he's zoned out for 24 hours? And we know that he had these sleep problems before the fact. So, there is a question... You have evidence he slept for 24 hours straight before the fact? We know that before the fact he demonstrated, he called his sleep problem one where he would just simply fall asleep. We know it was significant enough that a friend of his was worried about his safety because of these sleep problems. Now, what the extent of it was, we don't know because he didn't keep his appointment before this incident. But we know now, he can sleep for 24 hours. How can you hold a job if you fall asleep for 24 hours straight? Well, there's several options there. It could be that he would have to have his medication altered. There's ways to work around that. And that's what the employer is saying in this case. That we need to be trying to find ways to work around the problems in this case, rather than throwing up our hands and saying, forget it, don't even try it. Because that's what a permanent total disability award in this case is for this gentleman, is us saying, forget it, you never have to even attempt to return to work again. Thank you. Thank you, Counselor.